# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**ALWAYS TOWING & RECOVERY, INC., et al.,**

  Plaintiffs,

  v.                                        Case No. 20-CV-919

**CITY OF MILWAUKEE, et al.,**

  Defendants.

## DECISION AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS AMENDED COMPLAINT

Always Towing & Recovery, Inc., Apys Cars, Inc., Brew City Towing, LLC, SP Towing, LLC, and Adams Recycling, LLC (collectively the "plaintiffs") sue the City of Milwaukee (the "City"), the Milwaukee Department of Public Works ("DPW"), the Milwaukee City Tow Lot, the Milwaukee Police Department ("MPD") (collectively the "City defendants"), and Miller Compressing Company, for alleged violations of the Sherman Act, 15 U.S.C. §§ 1, *et seq.*; the Clayton Act, 15 U.S.C. §§ 12, *et seq.*; the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45; the Pollution Prevention Act, 42 U.S.C. § 13101; and Wisconsin common law. (Docket # 13.) Both the City defendants (Docket # 18) and Miller Compressing (Docket # 27) move to dismiss the plaintiffs' amended complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons below, both motions to dismiss are granted and the amended complaint is dismissed.

## BACKGROUND

With the exception of Adams Recycling, the plaintiffs are Wisconsin companies performing vehicle towing services in the City of Milwaukee and surrounding areas. (Am. Compl. ¶¶ 21–25, Docket # 13.) Adams Recycling provides salvaging services. (*Id.* ¶¶ 164–69.) The plaintiffs allege that scrap metal recycling is a lucrative global business. (*Id.* ¶ 37.) The plaintiffs allege that the City of Milwaukee earned almost $1.9 million in revenue in 2017 from recycling (though not clearly from scrap metal recycling). (*Id.* ¶ 41.) In 1996, the City entered into a multiple year contract with the largest scrap metal recycling company in the Milwaukee Area, Miller Compressing, for the processing and recycling of all vehicles delivered to Miller. (*Id.* ¶ 51.) The plaintiffs allege that despite a requirement that the City open up its scrap metal recycling bidding process to other public companies, the City awarded the contract to Miller Compressing without allowing others to bid. (*Id.* ¶¶ 52–54.) In 2002, the City delivered 16,423 vehicles to Miller Compressing. (*Id.* ¶ 55.) In 2003, the City and Miller Compressing entered into a contract in which the City agreed to supply Miller Compressing with a certain percentage of the scrap vehicles disposed of by the City and Miller Compressing would pay the City a fixed price for each vehicle. (*Id.* ¶¶ 57–58.) From 2004 to 2009, the City delivered 40,000 vehicles to Miller Compressing for processing and recycling, resulting in city revenues exceeding $5,000,000. (*Id.* ¶ 60.) In 2009, the City extended its contract with Miller Compressing until 2023. (*Id.* ¶ 61.)

The plaintiffs allege that the towing industry plays a vital role in suppling metals to the scrap metal recycling industry. (*Id.* ¶ 64.) They allege that the City is attempting to use its governmental power to increase its profitability and injure its competitors. (*Id.* ¶¶ 67–81.) For example, the plaintiffs allege that Wis. Stat. § 342.40 governs abandoned vehicles and

allows a municipality or county to sell the vehicle. (*Id.* ¶¶ 74–75.) The plaintiffs allege that the City and the DPW City Tow Lot sell unclaimed vehicles for scrap at the City of Milwaukee Tow Lot. (*Id.* ¶ 76.) The City and the DPW compile a list of unclaimed vehicles that are available through a bidding system and the abandoned vehicle is sold to the highest bidder. (*Id.* ¶¶ 77–78.) The plaintiffs allege, however, that the City awards the vehicles to Miller Compressing even if it places a low bid or no bid at all. (*Id.* ¶ 79.)

1. *Allegations Specific to Always Towing*

The plaintiffs also allege that the City has four contracts for municipal towing and divides the contracts into two territories: Zone 1 and Zone 2. (*Id.* ¶¶ 83–84.) Each zone has two contracts for municipal towing: a contract for "police safekeeping" and a contract for "municipal citations." (*Id.* ¶¶ 85–87.) "Municipal citations" towing involves the towing of vehicles due to citations to public vehicles and abandoned vehicles. (*Id.* ¶ 88.) In 1998, CHI Towing held all four contracts for the City of Milwaukee municipal towing. (*Id.* ¶ 96.) Prior to 2016, Wisconsin statute provided that a vehicle could not be removed from private property without the owner's permission, a repossession judgment, or an issued citation for illegal parking. (*Id.* ¶ 89.) In 2004, CHI Towing subcontracted with Always Towing to aid in its municipal citation towing for the City. (*Id.* ¶ 99.) Always Towing's business, however, also consists of towing for private property owners and parties. (*Id.* ¶ 98.) The plaintiffs allege that in January 2011, the DPW informed Always Towing that it needed to prioritize towing for the City between 2 a.m. and 6 a.m. and that it would not be issuing citations for private property towing between those hours. (*Id.* ¶¶ 100–01.)

As a result of this practice by the City, private property owners lobbied to change the law so that citations would not have to be issued for vehicles on private property prior to

towing. (*Id.* ¶ 105.) The lobbying efforts were successful, and legislation was passed in 2016 allowing private property owners to have vehicles towed off of their properties without having a citation issued. (*Id.* ¶¶ 106–09.) The plaintiffs allege that after passage of this law, the City lobbied for the adoption of Emergency Rule 15-14, which imposes pricing restrictions and notification requirements upon towing companies in the City. (*Id.* ¶ 111.) Emergency Rule 15-14 was passed and created Trans § 319. (*Id.* ¶ 117.) The plaintiffs allege that prior to the passing of Emergency Rule 15-14, there was no existing or proposed state regulation governing the towing of vehicles from private property. (*Id.* ¶ 119.)

However, in 2014, the City began holding public hearings and the Common Council created a task force to "review and make recommendations relating to City licensing and regulation of recycling, including junk collections and junk dealing, second-hand vehicle dealing, salvage and wrecking, and metal recycling and scrapping." (*Id.* ¶ 121.) Following the recommendations of the Task Force, the City created two new licenses for the Recycling, Salvaging, and Towing market: the Recycling, Salvaging, or Towing Vehicle License ("RSTV") and the Recycling, Salvaging, or Towing Premises License ("RSTP"). (*Id.* ¶ 128.) The plaintiffs allege that while Always Towing and other private companies are required to hold these licenses, the City does not hold a RSTP License to operate the municipal city tow lot even though it engages in the business of recycling, salvaging, or non-consensual towing. (*Id.* ¶¶ 131–33.)

    2.    *Allegations Specific to Adams Recycling*

The plaintiffs allege that in 1998, Nick Adams started Tows R Us and that same year, CHI subcontracted with Tows to tow cars from the City tow lot to Miller Compressing. (*Id.* ¶ 143.) Adams signed a contract with Miller Compressing to tow vehicles

under Tows from the City tow lot to Miller Compressing for $21 per vehicle towed. (*Id.* ¶ 155.) In 2005, Adams was going to sign a contract with Miller Compressing to continue to tow vehicles from the City tow lot to Miller Compressing, however, the City began taking salvage to Miller Compressing by trailers. (*Id.* ¶ 156.) Adams subsequently sold Tows and started Adams Recycling. (*Id.* ¶¶ 158–61.) In 2009, Miller Compressing contacted Adams about paying him $1,000 a week to buy salvage vehicles, run the titles, and log the information in Adams Recycling's logbooks. (*Id.* ¶¶ 164–65.) After Adams would buy the vehicles, run the titles, and log the vehicles, Adams would then sell the vehicles to Miller Compressing and Adams would receive 20% of the price of the vehicle. (*Id.* ¶ 166.) In 2010, the City began processing cars at the municipal tow lot, connecting the vehicles to a semi, and taking these vehicles to Miller Compressing. (*Id.* ¶ 172.) The plaintiffs allege that the City has a bidding system called J-Bid for salvage and auto dealers to use to bid on vehicles for recycling and salvaging and to bid on a vehicle, towing companies have to write in on a sheet the vehicle's make, model, and VIN with the amount of the bid to be placed. (*Id.* ¶¶ 167–69.) The plaintiffs allege that Miller Compressing is receiving a fixed number of vehicles that it does not place bids on or have the highest bids for. (*Id.* ¶ 170.)

        3.      *Allegations Specific to Apys Cars*

The plaintiffs allege that the towing contracts for Zone 1 and Zone 2 are three-year contracts where the City takes requests for bids. (*Id.* ¶ 177.) In 2016, Apys placed a bid for a City towing contract and Apys was soon informed that it had the lowest bid and if "everything checked out," it would be awarded the Zone 1 contracts. (*Id.* ¶¶ 180, 183.) Two weeks later, however, Apys was informed that it would not get the contract because the City believed that Apys could not efficiently and financially support the contract. (*Id.* ¶ 184.) The

contract was subsequently awarded to Prairie Land Towing, despite Apys having the lowest bid. (*Id.* ¶ 193.) In 2018, Apys' RST License was not renewed (*id.* ¶¶ 202–16); however, the Milwaukee County Circuit Court reversed and remanded the decision and allowed Apys to operate as if it possessed a valid RST license while the appeal was pending (*id.* ¶¶ 220–24). The plaintiffs allege that an MPD officer falsely informed one of Apys' towing clients that Apsy does not have a valid license, causing Apys to lose the client. (*Id.* ¶¶ 225–30.)

    4.    *Allegations Specific to Brew City Towing*

The plaintiffs allege that Brew City Towing was formed in 2015 and subcontracted with Apys to tow vehicles. (*Id.* ¶¶ 232–33.) Brew City applied for an RST License in 2016; however, it was only approved to do nonconsensual towing and not private property—in other words, Brew City could only take vehicles to the municipal tow lot. (*Id.* ¶¶ 237–38.) The plaintiffs allege that the City sent MPD officers to Brew City's property unannounced to check its calls, logs, and paperwork related to the business and that MPD officers unlawfully threatened to fine and ticket Brew City for impounded cars, causing them to lose business and money. (*Id.* ¶¶ 244–49.)

    5.    *Allegations Specific to SP Towing*

The plaintiffs allege that SP Towing subcontracted with Apys in 2018 and applied for an RST license for nonconsensual towing and operating a premises within the City of Milwaukee. (*Id.* ¶¶ 252–55.) The plaintiffs allege that SP Towing was erroneously informed by the City that its RST license was denied because two towing companies could not operate on the same lot. (*Id.* ¶ 256.) The plaintiffs allege that an MPD officer called SP Towing to inform it that the license it held did not permit it to perform nonconsensual

towing within the City. (*Id.* ¶ 263.) The plaintiffs allege that the City's actions caused injury to SP Towing's business. (*Id.* ¶¶ 259–64.)

## STANDARD OF REVIEW

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of the complaint on the basis that the plaintiff has failed to state a claim upon which relief can be granted. A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has interpreted this language to require that the plaintiff plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Ashcroft v. Iqbal*, the Supreme Court elaborated further on the pleadings standard, explaining that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," though this "standard is not akin to a 'probability requirement.'" 556 U.S. 662, 678 (2009). The allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citation omitted).

When determining the sufficiency of a complaint, the court should engage in a two-part analysis. *See McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). First, the court must "accept the well-pleaded facts in the complaint as true" while separating out "legal conclusions and conclusory allegations merely reciting the elements of the claim." *Id.* (citing *Iqbal*, 556 U.S. at 680). Next, "[a]fter excising the allegations not entitled to the presumption [of truth], [the court must] determine whether the remaining factual allegations 'plausibly suggest an entitlement to relief.'" *Id.* (citing *Iqbal*, 556 U.S. at 681). As explained in *Iqbal*, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the reviewing court to draw on its judicial experience and common sense." 556 U.S. at 679. All factual allegations and any reasonable inferences must be construed in the light most favorable to the nonmoving party. *Price v. Bd. of Educ. of City of Chicago*, 755 F.3d 605, 607 (7th Cir. 2014).

## ANALYSIS

The plaintiffs sue under the Sherman Act (Claims One and Two), the Clayton Act (Claim Three), the Federal Trade Commission Act (Claim Four), the Pollution Prevention Act (Claim Five), and Wisconsin common law (Claim Six). (Docket # 13.) I will address each in turn.

1. *Sherman Act Claims (Claims One and Two)*

The plaintiffs sue under §§ 1 and 2 of the Sherman Act. Antitrust laws forbid several forms of anticompetitive conduct. Section 1 of the Sherman Act prohibits agreements that unreasonably restrain trade. 15 U.S.C. § 1. Section 2 prohibits monopolization, or the attempt at it, through willful, anticompetitive acts. *Id.* § 2; *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 826–27 (7th Cir. 2019). A plaintiff must prove three elements to succeed under § 1 of the Sherman Act: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) (internal citation omitted).

The City defendants argue that the amended complaint fails to meaningfully allege a conspiracy under the Sherman Act. (Defs.' Br. at 4.) While the plaintiffs generally allege that the City conspired with Miller Compressing to maintain or acquire a dominant position in the recycling, salving, and towing industry by excluding competitors in the industry,

8

Case 2:20-cv-00919-NJ    Filed 10/21/20    Page 8 of 15    Document 31

(Am. Compl. ¶¶ 2–4), the facts specific to each plaintiff do not bare this out. Of the factual allegations pled in Claim One to each specific plaintiff, only the claim of Adams Recycling even mentions conduct by Miller Compressing. (Am. Compl. ¶¶ 141–73.) As summarized above, Always Towing alleges that the City created a scheme of licenses and regulations meant to create unfair business practices. (*Id.* ¶¶ 82–140.) Apys Cars alleges that the City improperly denied it a towing contract and interfered with its business. (*Id.* ¶¶ 174–230.) Brew City Towing alleges the City improperly limited the types of towing it could perform, delayed the renewal of its license, and sent task force members to review the company's information. (*Id.* ¶¶ 231–249.) And SP Towing similarly alleges that the City improperly denied it a license, interfered with its contracts, and limited its ability to compete in the towing market. (*Id.* ¶¶ 250–264.)

For a claimed conspiracy to survive a motion to dismiss, *Twombly* requires that it be plausibly pled through allegations of fact that generally take one of two forms: "(1) direct allegations of an agreement, like an admission by a defendant that the parties conspired; or (2) more often, circumstantial allegations of an agreement, which are claimed facts that collectively give rise to a plausible inference that an agreement existed." *Alarm Detection Sys., Inc.*, 930 F.3d at 827. The Seventh Circuit's analysis in *Alarm Detection Sys.* is instructive. In that case, the Village of Schaumburg passed an ordinance requiring commercial buildings to send fire-alarm signals directly to the local 911 dispatch center. 930 F.3d at 818. The area's dispatch center had a decade-old exclusive arrangement with Tyco Integrated Security, LLC; thus, to send signals to the dispatch center, local buildings had to use Tyco equipment. *Id.* at 818–19. Several of Tyco's competitors sued the Village, the dispatch center, and Tyco under constitutional, antitrust, and state tort law. The plaintiffs alleged

that the defendants "'carefully scripted' a 'clear design' to pass the Ordinance and issue the Notice—and then 'share in the spoils.' The defendants entered into this conspiracy, the Companies submit, knowing that Tyco was 'the sole provider of receiving equipment at [the dispatch center],' knowing that the Ordinance and the Notice would make Tyco the 'sole provider of all transmission equipment,' and knowing that the defendants could then reap the profits of a one-provider market." *Id.* at 827.

The district court dismissed the complaint, concluding the allegations failed to state a claim. The Seventh Circuit upheld the district court's conclusion. The court found that the complaint alleged "no facts suggesting that an agreement—as opposed to an independent, legislative decision—led Schaumburg to pass the Ordinance and issue the Notice." *Id.* at 827–28. The court reached this conclusion despite the plaintiffs' allegations that: the dispatch and Tyco had an exclusive equipment provider relationship, the Village passed an ordinance and issued a notice essentially requiring accounts to obtain Tyco equipment, that Tyco charged more to customers than its competitors for comparable products and services, and that all three defendants will profit by way of this arrangement. *Id.* The court found that "[g]etting from these allegations to the nefarious conspiracy asserted by the Companies requires a speculative leap, not a reasonable inference." *Id.*

In this case, the allegations in the plaintiffs' amended complaint are significantly more deficient than the allegations in *Alarm Detection Sys.* The plaintiffs allege neither direct nor circumstantial allegations of an agreement between the City and Miller Compressing to pass the injurious laws. Again, the plaintiffs have no allegations whatsoever that Miller Compressing had anything to do with the City's actions in regulating the towing industry through the passage of the RSTP and RSTV licensure requirements. At best, the plaintiffs

allege that the City, through its contract with Miller Compressing, violated two alleged requirements: (1) that the City's contracting process "must be open to the public to allow for bids to be placed" (which it failed to do) (Am. Compl. ¶¶ 52–54) and (2) that abandoned vehicles must be sold to the highest bidder (of which Miller Compressing was not) (*id.* ¶¶ 75–81). None of these alleged facts, however, collectively give rise to a plausible inference that an agreement existed between the City and Miller Compressing to unlawfully control the recycling, towing, and salving marked in Milwaukee. Thus, the amended complaint fails to plead a plausible antitrust conspiracy under § 1 of the Sherman Act and must be dismissed.

The plaintiffs also allege the defendants violated § 2 of the Sherman Act. Again, § 2 prohibits monopolization, or the attempt at it, through willful, anticompetitive acts. *Alarm Detection Sys.*, 930 F.3d at 827. Section 2 liability requires "willful, anticompetitive conduct." *Id.* at 828. The only conduct alleged in the plaintiffs' second claim is the City ceasing to issue citations from 2 a.m. until 6 a.m., lobbying for the passage of Emergency Rule 15-14, using the Task Force's recommendations to create the RSTV and RSTP licenses, and allegedly improperly renewing and/or denying the licenses of Apys and SP Towing. (Am. Compl. ¶¶ 265–72.) These are not allegations of willful, anticompetitive conduct. These are allegations of a City government acting under its lawful authority and the plaintiffs disagreeing with the results. These allegations do not plausibly plead an antitrust violation under § 2 of the Sherman Act. Thus, Claim Two is also dismissed.

    2.    *Clayton Act Claim (Claim Three)*

The plaintiffs allege the defendants violated § 4 of the Clayton Act. (Am. Compl. ¶¶ 273–80.) The Clayton Act permits suit by "any person who shall be injured in his business

or property by reason of anything forbidden in the antitrust laws . . . ." 15 U.S.C. § 15(a). Although not crystal clear, I assume the plaintiffs' allegations under the Clayton Act are for damages stemming from the alleged Sherman Act violations. Given the amended complaint fails to state a claim under the Sherman Act, it similarly fails to state a claim under § 4 of the Clayton Act, which "focuses on the *type* of injury claimed by a *particular* plaintiff and demands that it be an 'antitrust injury.'" *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1419 (7th Cir. 1989) (emphasis in original). As such, Claim Three is also dismissed.

### 3. *Federal Trade Commission Act Claim (Claim Four)*

The plaintiffs allege the defendants violated § 5 of the Federal Trade Commission Act. (Am. Compl. ¶¶ 281–300.) Section 45 of 15 U.S.C. empowers the Federal Trade Commission to "prevent persons, partnerships, or corporations . . . from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(2). While the plaintiffs seem to acknowledge there is no private right of action under § 5 of the FTCA (Pls.' Br. at 8), the plaintiffs urge the Court to judicially imply a private right of action (*id.* at 9). But the statutory language of § 5 is quite clear—"***The Commission* is hereby empowered and directed** to prevent persons, partnerships, or corporations . . . from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(2) (emphasis added). *See also Rosco v. Equifax*, No. 1:14-CV-141, 2015 WL 1402063, at *3 (N.D. Ind. Mar. 25, 2015) ("Indeed, the Federal Trade Commission Act does not create a private right of action, and thus, this argument also fails to defeat a finding of futility."); *Stanley v. Select Portfolio*, No. 07-CV-775-JPG, 2008 WL 2020509, at *3 (S.D. Ill. May 9,

12
Case 2:20-cv-00919-NJ   Filed 10/21/20   Page 12 of 15   Document 31

2008), *aff'd as modified sub nom. Stanley v. Hollingsworth*, 307 F. App'x 6 (7th Cir. 2009) ("[T]he Federal Trade Commission has original jurisdiction over FTCA actions, and no private right of action exists under the FTCA."); *Carrel v. George Weston Bakeries Distribution, Inc.*, No. 1:05-CV-01769-SEBJPG, 2006 WL 1005041, at *1 (S.D. Ind. Apr. 13, 2006) ("The Clayton Act creates a private right of action, while the Federal Trade Commission Act does not."). For these reasons, Claim Four is dismissed.

    4.    *Pollution Prevention Act Claim (Claim Five)*

The plaintiffs allege the defendants violated the Pollution Prevention Act, 42 U.S.C. § 13101. It is unclear under what authority the plaintiffs bring this cause of action. Section 13101 does not appear to provide a vehicle for damages or recovery. Perhaps the plaintiffs intended to bring a citizen suit pursuant to 42 U.S.C. § 11046, but I decline to speculate. The plaintiffs are not proceeding *pro se*. I cannot decipher a cause of action in Claim Five. It is dismissed.

    5.    *State Tort Claim (Claim Six)*

Finally, the plaintiffs allege the defendants interfered with the contracts of Apys Cars and SP Towing under Wisconsin common law. (Am. Compl. ¶¶ 315–38.) With the federal claims dismissed, I will follow the general rule by relinquishing jurisdiction over the supplemental state law claim. *See Redwood v. Dobson*, 476 F.3d 462, 467 (7th Cir. 2007) ("A court that resolves all federal claims before trial normally should dismiss supplemental claims without prejudice."). Thus, the plaintiffs' state law claim is dismissed without prejudice.

6. *Leave to Amend*

The plaintiffs request that they be allowed to correct "whatever defect the court deems necessary" because this matter is in the early stages of litigation. (Pls.' Br. at 17.) The Seventh Circuit has stated that a "plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed" and that when "a district court denies a plaintiff such an opportunity, its decision will be reviewed rigorously on appeal." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519 (7th Cir. 2015). The amended complaint currently before me is already the plaintiffs' attempt to correct the deficiencies noted by the City defendants in their first motion to dismiss. The amended complaint fails, however, to cure the deficiencies as to the Sherman and Clayton Act claims. And no amount of amendment could create an avenue for relief under the Federal Trade Commission Act and the Pollution Prevention Act when none are provided. The *Runnion* court states that when "it is clear that the defect cannot be corrected so that amendment is futile," there is no harm denying leave to amend and entering final judgment. *Id.* at 520. This is such a case where further amendment would be futile. As such, the defendants' motions to dismiss are granted and this case is dismissed.

## CONCLUSION

I find that the plaintiffs fail to state a claim upon which relief can be granted under the Sherman Act, the Clayton Act, the Federal Trade Commission Act, and the Pollution Prevention Act. I decline to exercise supplemental jurisdiction over the plaintiffs' state law claims.

**ORDER**

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motions to dismiss (Docket # 18) and (Docket # 27) are **GRANTED**. Claims One, Two, Three, Four, and Five of the amended complaint are **DISMISSED WITH PREJUDICE**. Claim Six is **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that the clerk of court shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 21st day of October, 2020.

BY THE COURT

_____
NANCY JOSEPH
United States Magistrate Judge